**UNITED STATES of America, Plaintiff,**

**v.**

**PEAVEY BARGE LINE, in personam, and the M/V GREMCO, Barge PV 5985, Barge PV 5996, Barge PV 5978, Barge ABS 1448, Barge UMC 2464, Barge PV 5903, Barge PV 2926, Barge PV 2923, and Barge PV 5997, their appurtenances, etc., in rem, Defendants.**

**No. 81–4044.**

United States District Court, C.D. Illinois.

Jan. 9, 1984.

calendar year 1984.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for plaintiff.

Alan Blackwood and Marvin L. Schrager, Moline, Ill., Gary Sacks and John R. Halpern, St. Louis, Mo., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, District Judge.

This cause is pending for decision following a bench trial limited to the issue of allowable damages.

At all times pertinent to this cause, the United States owned Lock and Dam No. 15, located in the Mississippi River, at Rock

Island, Illinois, and the Rock Island Arsenal Bridge, which is situated closely adjacent to, and upstream from, the dam. On July 15, 1978, the M/V Gremco, operated by defendant,[1] towing nine loaded barges, was moving downstream, approaching the dam from a northerly direction. As the tow approached the dam, one of the barges struck the upper end of a guide wall leading to the lock. The barges broke loose as a result of that impact. Some collided with the miter gates in the lock, inflicting substantial damage to the gates. Others floated downstream colliding, first, with sections of the bridge and, second, with the roller gates in the dam.

The substantial damage sustained by each the guide wall, the miter gates, and the bridge has now been repaired. The roller gates had not been repaired at the time of trial, and the only evidence as to the amount of damages sustained is an original estimate by the Rock Island District of the Corps of Engineers, of $12,627, if repairs were made by the Corps.

A summary judgment was entered on December 28, 1982, for the United States and against defendant on the issue of liability. The issue of liability having been determined adversely to defendant on both counts of the complaint, no comment upon the theories of complaint is necessary. It is noted that 33 U.S.C. § 408 imposes absolute liability for the damages done to the dam, which is a facility built by the United States for the preservation and improvement of navigable waters of the United States, while liability for damages done to the bridge is predicated upon a negligence theory.[2]

Defendant concedes that it is liable to the United States in the amount of $237,701, whereas the United States claims total damages in the amount of $430,929.82, plus prejudgment interest. Defendant contests the reasonableness of charges stated for repairs made to the miter gates, the guide wall and the bridge. It also contests certain overhead items which enter into the computation by the United States, and to the imposition of prejudgment interest.

### Repairs to the Miter Gates

The repairs to the miter gates were done by the Corps.[3] Temporary repairs were begun on July 31, 1978. The work was completed by April 27, 1979. There was no solicitation for bids from outside contractors. The gates had originally been constructed by riveting shortly after 1930. Because of variations in carbon in the original steel, as compared to modern steel, and variations in thickness of steel, the Corps had, since the advent of what is termed the huck fastener in the late 1960's, used the huck fastener method of repairing all riveted miter gates. The evidence tends to indicate that few, if any, general contractors have the equipment which huck fastening entails, or experience in its use. Repair to the miter gates required that the gates be removed from the lock onto repair barges, the same being replaced in the interim by temporary replacement gates.[4] The huck fastener is a modern version of the rivet. Its use entailed the removal of damaged steel from the gate, the punching of corresponding holes in the original steel, the new steel and appropriate fastening plates to accommodate the huck fasteners. The installation of the fasteners through those corresponding holes required a two-man crew. A total of 9,432 man-hours were expended in making the repairs to the gates, including their removal from and

---

1. The term "defendant" refers in all instances to the defendant, Peavey Barge Line.

2. A judgment was also previously entered assessing a statutory penalty against each of the defendant vessels. That judgment has been paid and satisfied.

3. Specifically, the work was done by the Rock Island District of the United States Corps of Engineers. The term "the Corps," unqualified, is a reference herein to the Rock Island District. As the context requires, references to the Corps of Engineers, to other districts, and, at times, to Rock Island, are specifically denoted.

4. Miter gates are interposed in pairs on opposite sides of the lock. Corps' witnesses described each gate as being about 65 feet long, with a weight of about 80 tons.

reintroduction into the lock complex. The cost figure claimed by the United States for that repair totalled $232,024.57.

■ Defendant attacks the method of repair used by the Corps as rendering the repair costs claimed unreasonable. It also challenges the inclusion in the computation of certain claimed items of expense related principally to claimed overhead items.

Defendant's major challenge to the charges stated for repair of the miter gates is fairly summarized by its contention that welding, in lieu of the huck method, presents a more efficient method of repair. However, the evidence upon which it relies has no considerable tendency to sustain its position. A marine surveyor did testify that the upper Mississippi, specifically the Rock Island, St. Louis and St. Paul Districts of the Corps, is the only area in which huck fastening is widely used. He fortified his opinion in favor of welding over huck fastening by his reference to gate repairs made at various points on the Ohio River, at Lock 26 in the St. Louis District, and repairs done in 1982 on the gates at Lock 9 by a private contractor in the St. Paul District. Yet there was a woeful lack of specificity in his testimony related to the type of fabrication of the original gates being repaired, or the age of the gates, by comparison to the gates at Lock 15. The one exception is the Lock 9 gates, which are shown to be about the same age as those at Lock 15 and to have been originally fabricated by riveting. Repairs to those gates were made by the welding process. The one positive statement found in the evidence, related to the other incidents cited, is the rebuttal testimony of a Rock Island employee that the Lock 26 gates had been originally fabricated by welding.[5] Thus the Lock 9 repair is the only certain instance reflected in the evidence in which repairs to the 1930's riveted gate were done by the welding method.

Also, the evidence as to comparative cost effectiveness of welding over huck fastening upon riveted gates is far short of convincing. Defendant's expert witness, Dr. Gomez, who was the consulting engineer on the Lock 9 repairs, estimated that that repair had entailed the use of more than 60,000 pounds of steel, as opposed to slightly more than 50,000 pounds billed by the Corps on Lock 15. Although he did not have complete cost figures for Lock 9, he estimated that those repairs had a total cost figure in the range of $310,000, which included a consulting fee paid to his firm in the amount of $150,000. He did admit that not all steel can be welded, and that welding of the type steel used in both Lock 9 and Lock 15 requires extensive chemical analysis and radiological analysis to determine whether welding could be used as a proper method of repair. Rock Island had done some of the work on Lock 9. Its charges were not included in Dr. Gomez's estimate of total cost.

Samuel Doak, a structural engineer, who is chief of the design branch at Rock Island, testified on rebuttal, subject to an objection by the defendant.[6] He testified that the Lock 15 gates were fabricated from A–7 steel which was manufactured without quality controls adequate to achieve a uniform carbon content. He testified that some A–7 steel is weldable while other steel of the same genre is not, and that it is entirely possible in a single gate to encounter some steel which is weldable and some which is not. Analysis of each section of steel is thus necessary to determine whether or not it can be welded. Before testifying, Mr. Doak had examined defendant's Exhibit 1, an engineering appraisal prepared by Dr. Gomez's organization, which concluded that it would have been practical and feasible to have repaired

---

5. Only Rock Island, on the upper Mississippi, has gate-pulling equipment. As a consequence, it serves also the St. Louis and St. Paul Districts on contract for that chore, and in some instances on major lock gate repair as well, as the needs arise.

6. The objection is overruled. It is patent in the trial transcript that his testimony was proper rebuttal, responsive to opinions stated by Dr. Gomez and other expert testimony adduced by the defendant.

the Lock 15 gates by the welding method. Doak testified that material references in that appraisal are limited entirely to A–36 steel which was first fabricated in about 1960. He found no reference whatsoever to A–7 steel as the material treated in that appraisal.[7]

The evidence does not admit of any intelligible cost comparison between the repairs to the Lock 9 gates and the repairs to the Lock 15 gates, although it does include positive testimony as to certain specific costs incurred in the Lock 9 incident which refute Dr. Gomez's estimate of total cost. Dr. Gomez's firm was paid $150,000 in consulting engineers fees. A Rock Island official testified in rebuttal that his district had been paid $190,000 by St. Paul for services which it had rendered to the Lock 9 project. Clearly, those two items alone exceed the $310,000 estimate of total costs to which Dr. Gomez testified. The same rebuttal witness testified that the most recent figures which he had seen, as compiled by St. Paul, reflected a total repair cost in excess of $600,000 for the Lock 9 repairs.

█ Not only does the total comparative evidence have no tendency to refute the reasonableness of the basic charges for the Lock 15 gate repairs, but it also must be recognized that the owner of damaged property does have discretion to choose the repair method which is deemed by him best suited to the restoration of his property to its predamaged state. *Midwest Marine, Inc. v. Sturgeon Bay Shipbuilding and Dry Dock Co.,* 247 F.Supp. 283, 289–90 (E.D.Wis.1965). A damage claim is supported by proof that the repairs made, by whatever method repairs were achieved, were required by injury to property which was caused by the defendant. *Pizani v. M/V Cotton Blossom,* 669 F.2d 1084, 1088 (5th Cir.1982).

The Corps' statement for repair costs includes the cost for slightly in excess of 50,000 pounds of steel. Defendant challenges that item for the reason that the

poundage substantially exceeds initial damage survey estimates as to the amount of steel required to effect repairs to the gates. However, the testimony of Corps' witnesses fairly supports the finding that the steel requirements are accurately stated in the cost computation.

Related to the miter gate repair, the United States claims a basic cost of repairs in the amount of $191,931.65, plus District overhead in the amount of $31,092.92, which renders a total repair cost of $223,-024.57. Defendant challenges that computation upon two bases. The first is that the basic repair figure does include certain items of overhead which are claimed to be directly chargeable to the repair job itself. The second challenge relates to the District overhead figure.

█ The amounts of the several overhead items included in the base charge for gate repairs were derived by applying a percentage factor, pursuant to Corps practice, to various of the items included in the basic cost of repairs. Reasonable overhead charges are properly recoverable on a property damage claim, and the use of a fixed percentage of specific costs is a reasonable method for assessing such costs. *Baltimore & Ohio R. Co. v. Commercial Transport, Inc.,* 273 F.2d 447, 448–449 (7th Cir. 1960); *compare United States v. M/V Gopher State,* 472 F.Supp. 556 (E.D.Mo.1979), *aff'd,* 614 F.2d 1186 (8th Cir.1980). A plaintiff claiming the right to assess an overhead item does have the burden of proving that there exists a reasonable basis to apply that item to a particular repair claim. Such proof is lacking as to several items of overhead which the United States claims in its stated charge for repair to the miter gates.

The evidence does not support the claim of $38.41 for "handling charges" on the item for supplies and materials. There is also no evidentiary support for the overhead items for "per diem and transporta-

---

**7.** Mr. Doak was not directly involved in the Lock 9 repairs. At the request of the Corps, an engineering appraisal of the Lock 9 situation had been prepared under his supervision, which concluded that it "wouldn't be wise to weld A–7 steel" because of its lack of material integrity.

tion" in the amount of $1,101.62. The same is true for the item "reproduction" in the amount of $24.90. A closer question is presented as to the item "tool, furniture and equipment replacement" in the amount of $922.56. Tools and equipment do wear out in time, but there is lacking any evidentiary proof that that item bears any reasonable relationship to the Corps' experience in equipment breakage and obsolescence. The claim is thus reduced by $2,089.49, the aggregate of those four items of basic overhead.

Other items of overhead in the basic category are found to bear a reasonable relationship to the exigencies of this repair job and sound business practices.

The claim for District overhead is wholly consistent with business practice and adequately shown to be realistically based upon the Corps' experience in its overall operations. Defendant's argument that the figure claimed has the effect of charging overhead on overhead has a superficial appeal, yet it lacks merit. To the extent that reasonable overhead charges are assessed to a particular project, those charges become a part of the base cost of the project itself.

The United States is entitled to judgment against the defendant for its damages to the miter gates as follows:

| | |
|---|---|
| Base charges for miter gate repair | $ 189,842.14 |
| District overhead [8] | 28,981.67 |
| Total amount for judgment | $ 218,823.81 |

### The Guide Wall Repairs

As a result of the Gremco collision, about 15 feet of the upper guide wall to the lock was broken off below the water line. That wall was constructed of concrete and reinforcing steel. In 1979 the Corps solicited bids from hundreds of private contractors for that repair. Prior to the solicitation of bids, the Corps had estimated the cost of repair to be the sum of $40,400. The lowest of the bids received was approximately $85,000. Since the Corps was prohibited

from accepting any bid which was more than 125% of its estimate, all bids were rejected. The repair work was readvertised for bids, based upon a revised Corps' cost estimate of $62,000. When the new bids were received in October 1979, it was found that the low bid of $85,611 was still more than 125% of the Corps' estimate. At that point the Corps again revised its estimate to include a theretofore omitted item, namely the travel costs of the low bidder to the project, and accepted the bid for $85,611.

That contract figure is challenged as unreasonable. Defendant's position is of the broadside category. It argues that it was incumbent upon the Corps to have contacted the bidders to determine why there was a disparity between the bid price and original estimates, in the context of the fact that there is no evidence that any such contacts were made. It argues that there was no reason to rush the repairs and that the Corps could have revised its bid advertisement to specify that repairs would be made during summer months when it could reasonably be expected that water levels would be low. Finally, it argues that the Corps possessed the equipment and personnel to do the work itself, instead of its having chosen to solicit bids from private contractors. The whole argument is fortified by the testimony of Dr. Gomez and defendant's witness, Mr. Corsa, who both opined that the work should not have cost more than $60,000. It emphasizes its argument by the observation that no witness at the trial stated the opinion that the contract price of $85,611 for repairing the guide wall was fair and reasonable.

The total argument rests upon the thesis that the Corps had no discretion in the determination whether it would do the work itself or contract it privately. And it simply is not true that there is no evidence to support the reasonableness of the contract price. The second round of bids themselves fully support the reasonable-

---

8. The disallowed items claimed for basic overhead are computed to be slightly less than 1.1% of the base repair figure of $191,931.65. The 1.1% factor was applied in reduction of the claim for District overhead.

ness of the charge. Only pure speculation could support the proposition that a third bid, or a fourth bid, or a twelfth bid would have changed the contractors' evaluations of the reasonable value of the work to be done. The court finds that the contract price of $85,611 is fully supported by the evidence and that the same is a reasonable cost of the repairs made.

Again certain overhead items are claimed as a part of the basic charge, to which District overhead is added to render a total claim of $94,478.25. It must be found that certain of those items are not supported by the evidence adduced.

An item for Corps "labor" in the amount of $4,825.59 is found to be an appropriate charge. That charge is supported by testimony that the figure is derived from time cards for the time of Corps laborers devoted to the repair project. An item of $1,562.90 for "technical indirect" is claimed. That item, as was the comparable item claimed in the gate repairs, is a percentage of Corps labor charges deemed to be reasonable to compensate the Corps for time spent by its technical people related to the wall repair.[9] The item reflects a necessary facet of the repair project which the court finds to have requisite evidentiary support and to be a reasonable charge.

Other claims for basic overhead costs are not adequately supported by the evidence adduced and the same will be disallowed. Those are items for "tool, etc., replacement" in the amount of $68.16, "reproductive service" in the amount of $682.23, and "other facility charges" in the amount of $422.63, which renders a total figure of $1,173.00.

Judgment will enter for the United States for the guide wall repairs as follows:

| | |
|---|---|
| Contract price | $ 85,611.00 |
| Labor | 4,825.59 |
| Technical indirect | 1,562.90 |
| Basic repair cost | $ 91,999.49 |
| Plus District overhead [10] | 1,122.94 |
| Total amount for judgment | $ 93,122.43 |

### The Bridge Repair

The Arsenal Bridge, between Davenport, Iowa, and the Rock Island Arsenal Island, was, at the time of the Gremco collision, under the supervision and control of the Omaha, Nebraska, District of the Corps of Engineers. Prior to the Gremco collision, the bridge was scheduled to undergo extensive rehabilitation and renovation. Plans and specifications had been drawn and bids had been solicited, based upon an estimated renovation cost in the range of $1,000,000.

Following the Gremco collision, the Chief of Engineering at Rock Island surveyed the damages caused by the collision of the Gremco barges with the bridge and estimated the cost to repair such damage at $50,000. In addition, the Corps retained the engineering consulting firm of Modjeski and Masters to prepare an outside estimate of such damage. Its report described damages done to spans III, IV, V and VI of the bridge. Its estimate of the reasonable costs for repair of such damage was $50,000.

Thereafter, the Omaha District submitted to its list of prospective bidders an amendment to its outstanding bidding request to include the repair of the collision damage as an additional element of the previously-planned major rehabilitation. Two bids were received in response to that prior bid solicitation, but only one bid included the collision repairs as a part of its total bid. That bid was accepted by the Omaha District at a total contract price of $920,000, $96,000 of which was allocated to the collision damage repair. That bid was

---

9. The testimony shows that services of technical people, i.e., engineers, etc., devoted to the repair of an hour or more duration, were charged to the job as labor. In addition, such persons had devoted work of less than one hour to the project which was not recorded as a direct charge against the project. A percentage of technical salaries was applied to obtain the "technical indirect" charge to compensate the Corps for such unrecorded service.

10. The disallowed items are computed to represent approximately 14% of those items upon which District overhead was computed by the United States. The claim for District overhead is allowed, on the basis of 86% of the amount claimed.

accepted despite the disparity between the Corps' estimates and the $96,000 figure, since the total bid for the project was legally within the parameters of the combined Corps of Engineers' estimates for both renovation and casualty repair.

Defendant attacks that disparity—first, insisting that the reasonable cost of the bridge repair was the Corps of Engineers' estimates of $50,000, and secondly, by asserting that the amendment submitted to prospective bidders for the casualty repair included repairs to span VI, when, in fact, as it contends, the collision damage affected only spans III, IV and V. Defendant attempts to support its second hypothesis by reference to the testimony of Clarence Levings and to the damage report prepared by Modjeski and Masters.[11] Those evidentiary citations fail to support its contention. Mr. Levings was, at the time of the Gremco occurrence, employed as a construction inspector by the Omaha District. He testified that shortly after July 15, 1978, he accompanied other personnel of the Corps of Engineers who were making a survey of the collision damage and taking photographs of the bridge. He testified on direct examination that he had then observed damage to spans III, IV and V of the bridge, and he catalogued the extent of the observed damage to the best of his recollection. When asked on cross-examination whether he had observed any damage to span VI, he testified that he could not remember whether any such damages had then been observed. The consulting engineer's report, when read in its entirety, refutes defendant's position that the collision caused no damage to span VI. That report clearly includes observed damage which did affect span VI.

Defendant's first point of challenge rests upon hypothesis which never occurred. It certainly was a reasonable solution to amend the original bid specifications for major bridge rehabilitation to invite the inclusion of the cost of collision repair. Of course, the Omaha District might, as defendant suggests, have solicited bids for the collision damage alone, separate from the total rehabilitation bid solicitation. Only pure speculation could lead to any inference that bids upon a separate solicitation could be obtained, or any inference that any bid which might have been obtained would have been less than the $96,000 figure included in the total contract. Any such inference, if drawn, would have no tendency to verify the opinions of defendant's experts that a reasonable cost of repair would have ranged between $50,000 and $55,000.

The evidentiary situation on this aspect of the damages question is not unlike that presented related to the guide wall repairs. The Corps of Engineers was faced with the need to obtain repairs of the collision damage occasioned by the Gremco event, and it chose one of several courses which it might have pursued. It should not be faulted on that account. The best evidence of the reasonableness of the charge is the one bid which was received. The court finds on all the evidence that the accepted bid of $96,000 was reasonable.[12]

In addition to the base contract price of $96,000, the United States claims an additional charge of $4,800 for inspection work and other work done by the Corps in administering the contract. That cost figure was derived by the application of a factor of 5% to the contract price. The court finds the claim for damages to the bridge to be reasonable. Judgment will be entered for the United States on this item in the amount of $100,800.

**11.** Plaintiff's Exhibit No. 58.

**12.** Another factor reflected in the evidentiary record affects the question of the reasonableness of a bid by comparison with Corps of Engineers estimates. Such estimates are largely limited to an assessment of the projected cost of labor and materials required. They include no factors for profit, costs to a contractor in moving onto a job at its inception and removing its equipment, etc., after completion, or for contingencies. It would seem to the court that the addition of those items must, in every instance, produce a bid by a private contractor which would be in excess of the estimate made by the Corps of Engineers.

*Damage to the Dam Roller Gates*

The Corps' estimate of this element of damage in the amount of $12,627 is not challenged. Judgment will be entered for that amount.

The United States is entitled to judgment for the aggregate of those allowable repair costs, which renders a figure of $425,373.24.

The United States is entitled to an award of prejudgment interest. In admiralty cases, prejudgment interest must be awarded to insure that the injured party is fully and fairly compensated for his loss. *Sea-Land Service, Inc. v. Eagle Terminal Tankers, Inc.,* 443 F.Supp. 532, 534 (W.D. Wash.1977). A court has no discretion to deny prejudgment interest unless the court finds that peculiar facts and circumstances exist which justify denial. The policy of awarding prejudgment interest in admiralty is not affected by the fact that the ultimate amount for damages is often made certain only upon the entry of a final judgment. *Ibid.* Admiralty claims for prejudgment interest are determined under federal law, without reference to any limitations which may be imposed by the law of the state in which the casualty loss occurred. *Ore Carriers of Liberia, Inc. v. Navigen Company,* 305 F.Supp. 895, 898 (S.D.N.Y.1969), *aff'd per curiam,* 435 F.2d 549 (2d Cir.1970). The award of prejudgment interest from the date of the loss is the rule, not the exception, unless peculiar facts and circumstances are shown which would invoke an exercise of discretion to deny the award. *United States v. M/V Martin,* 198 F.Supp. 171 (S.D.Ill.1961); *Complaint of M/V Vulcan,* 553 F.2d 489 (5th Cir.1977); *see American Zinc Co. v. Foster,* 441 F.2d 1100, 1101 (5th Cir.1971), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95; *Norfolk Shipbuilding & Drydock Corp. v. M/Y La Belle Simone,* 537 F.2d 1201, 1204 (4th Cir.1976). Since prejudgment interest is imposed to restore the injured party to the position existing before the wrong was done, a court may award interest deemed equivalent to the cost to the injured party of borrowing money.

*Sinclair Refining Company v. S.S. Green Island,* 426 F.2d 260, 265 (5th Cir.1970); *Complaint of M/V Vulcan, supra,* at 491.

It is recognized that there are decisions, and statements in legal opinions, which do tend to contradict certain of the above legal conclusions. In the absence of the citation of controlling authority from the Seventh Circuit Court of Appeals, the conclusions drawn are deemed to accurately state the applicable law.

There is lacking any proof of peculiar circumstances in this cause to invoke the exercise of discretion to deny prejudgment interest on this claim. Prejudgment interest will be awarded at a rate of 11% per annum from July 15, 1978, to the date hereof. It is recognized that precise determination of the cost of borrowing money over the period of time involved cannot be definitely made. The United States cites interest rates for the Treasury ranging between a high of 18.35% to a low of 11% from the third quarter of 1981 until the present time. Though the statement is not fully documented in the record, the court will take notice that the range cited is well within the ball park of the relevant money market. The 11% figure, if in error, errs to the conservative side. In the court's opinion, a somewhat higher rate could be fully justified.

The above opinion contains the court's findings of fact and conclusions of law.

### Judgment Order

Judgment is entered for the United States against the defendant in the amount of $425,373.24, together with prejudgment interest at the rate of 11% from July 15, 1978 to the date hereof. The United States shall also recover from defendant its costs of suit.