**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**PEAVEY BARGE LINE, in personam, and the M/V GREMCO, Barge PV 5985, Barge PV 5996, Barge PV 5978, Barge ABS 1448, Barge UMC 2464, Barge PV 5903, Barge PV 2926, Barge PV 2923, and Barge PV 5997, their appurtenances, etc.,** *in rem,* **Defendants-Appellants.**

**No. 84–1251.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1984.

Decided Nov. 8, 1984.

---

Daryl F. Sohn, Goldstein & Price, St. Louis, Mo., for defendants-appellants.

L. Lee Smith, Asst. U.S. Atty., Peoria, Ill., for plaintiff-appellee.

Before FLAUM, Circuit Judge, SWYGERT and FAIRCHILD, Senior Circuit Judges.

FLAUM, Circuit Judge.

This is an appeal of an admiralty case by the defendants following a bench trial which was limited to the issue of damages. The district court awarded the United States $425,373.24 for damages to a lock, dam, and bridge on the Mississippi River plus prejudgment interest at a rate of 11% from the date of the accident. For the reasons stated below, we affirm the decision of the district court.

## I.

On July 15, 1978, the defendant Motor Vessel Gremco, operated by the Peavey Barge Line, was towing nine loaded barges near Rock Island, Illinois when one of the barges struck the guide wall of Lock and Dam No. 15, which are owned by the United States. This collision caused the remaining barges to become detached and collide with the lock's miter gates, the Rock Island Arsenal Bridge, and the roller gates of the dam. The Rock Island District of the United States Corps of Engineers began temporary repairs to the miter gates on July 31, 1978, and completed these repairs on April 27, 1979. The United States employed a private contractor for the guide wall repairs, which were completed on June 6, 1980. Repairs to the Rock Island Arsenal Bridge were completed in mid to late 1979 by a private contractor as part of a previously planned major bridge rehabilitation and renovation. At the trial in September 1983, the dam's roller gates had not yet been repaired, but the Corps of Engineers submitted an estimate of repair costs which went unchallenged by the defendant.

The United States filed suit against the defendant on June 30, 1981, claiming that it should recover for the damages it sustained to the lock and dam based on a theory of absolute liability under 33 U.S.C. § 408 (1982)[1] and to the bridge based on a negligence theory. Following a confession of liability by the defendant, the district court entered summary judgment for the United States on the issue of liability on December 28, 1982, and ordered a $1,000 pecuniary penalty against each of the defendant's barges pursuant to 33 U.S.C. §§ 411 and 412. After a two-day trial at which the sole issue was the reasonableness of the damages claimed by the United States, the district court awarded the United States $425,373.24[2] plus prejudgment interest at a rate of 11% per annum from

1. 33 U.S.C. § 408 provides:

It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works....

2. The district court awarded the following amounts for the cost of repairs and overhead:

| | |
|---|---|
| **Miter Gates:** | |
| Base charges for miter gate repair | $189,842.14 |
| District overhead | 28,981.67 |
| Total amount | $218,823.81 |
| **Guide Wall:** | |
| Contract price | $ 85,611.00 |
| Labor | 4,825.59 |
| Technical Indirect | 1,562.90 |
| Basic Repair Cost | 91,999.49 |
| District overhead | 1,122.94 |
| Total amount | $ 93,122.43 |
| **Bridge Repair:** | |
| Contract price | $ 96,000.00 |
| District overhead (administrative expense) | 4,800.00 |
| Total amount | $100,800.00 |
| **Dam Roller Gates:** | |
| Unchallenged Corps' estimate (including $1,926.00 administrative expense) | $ 12,627.00 |

the date of the collision to the date of the judgment.

On appeal, the defendant claims that the district court's award of damages for such items as use of plant and equipment, use of shop and yards, motor vehicle usage, and labor on the guide wall was erroneous because these items lacked any evidentiary support. The defendant also challenges the award of overhead as being unrelated to the repair work caused by the collision and as being computed on items that constitute overhead themselves. Finally, the defendant disputes the grant of prejudgment interest from the date of the collision, if interest is granted at all, rather than from the date that the United States expended money to make the repairs. These issues will be addressed in turn below.

## II.

### A. Disputed Elements of Damages

■ In an admiralty case, as in a civil action under Rule 52(a) of the Federal Rules of Civil Procedure, the findings of fact of the district court may not be set aside unless clearly erroneous. *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 7–8, 99 L.Ed. 20 (1954); *Feeder Line Towing Service, Inc. v. Toledo, Peoria &*

*W. R.R. Co.*, 539 F.2d 1107, 1110 (7th Cir. 1976). According to the Supreme Court, a finding is "clearly erroneous" when although there is evidence to support it, the appellate court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). When reviewing for clear error in the district court's findings, the appellate court must be especially circumspect if there has been conflicting evidence on controverted issues of fact. *Indiana State Employees Ass'n v. Negley*, 501 F.2d 1239, 1241 (7th Cir.1974).

In this case, the defendant disputes the district court's award of $52,327.00 for use of plant and equipment on the miter gate repair project, $2,262.39 for use of shop and yards, $1,644.00 for motor vehicle usage, and $4,825.59 for the Army Corps of Engineers' labor on the guide wall repairs.[3] The defendant claims that the Corps merely offered testimony identifying each item rather than proving that the charge was necessary and reasonable.[4] The district court found that the charges for use of plant and equipment, use of shop and yards, and motor vehicle usage were items

*United States v. Peavey Barge Line*, 590 F.Supp. 319 at 324, 325, 326–27 (C.D.Ill.1984).

3. We do not find that the defendant waived its right to appeal the award of these costs. At oral argument, the defendant stated that it had objected to the four items of damages at issue from *the beginning of the suit in its answer and* also in its post-trial brief. In the Proposed Findings of Fact and Conclusions of Law section of its post-trial brief, the defendant stated that there had been no evidence offered which supported the charges for plant and equipment, use of shop and yards, labor for guide wall repairs, and motor vehicle usage. Record at 49, pp. 11–13, 20–21.

4. At trial, the Chief of Structural Maintenance, Donald Wagoner, testified that all records of plant and equipment use for the Gremco repair were kept in the Operations Division. Tr. I at 35, 37–38. The crane operator foreman, Otto H. Marion, testified that a log was filled out every day which noted the plant and equipment used for the job. Tr. I at 66. David Showalter, an Army Corps budget analyst, acknowledged that the exhibit shown to him by the United States

presented a summary of all the costs of equipment, motor vehicle charges, and incidental charges related to the miter gate repairs. Tr. I at 108. Mr. Showalter explained that the data on the summary was consolidated from all of the costs charged to a specific account number. Tr. I at 109. Mr. Showalter stated that the exhibit summarized the information relating to plant and equipment use, use of shop and yards, and motor vehicle usage. Tr. I at 111, 126. The defendant never objected to the admission of these summaries into evidence or requested that the underlying documents be produced in court. Mr. Showalter also testified that the Corps labor charge of $4,825.59 on the guide wall repairs was based on time card form 240 which indicates the worker's name and number of hours worked. Tr. I at 111, 117.

In its questioning of its own expert witnesses, the defendant merely asked its witnesses if the costs for the repairs to the miter gates and guide wall were reasonable rather than specifically questioning various elements of damages. Tr. II at 11, 22, 23, 25, 62, 63, 65.

which bore a "reasonable relationship to the Corps' experience in equipment breakage and obsolescence." *United States v. Peavey Barge Line*, 590 F.Supp. 319 at 323–324 (C.D.Ill.1984) ("Memorandum Opinion"). The district court noted that certain amounts for items claimed by the United States could be determined by applying a fixed percentage to specific costs. *Id.* However, the court noted that the plaintiff has to prove that there exists a reasonable basis to apply that item to a particular repair claim. *Id.* Applying this test, the court disallowed the United States' claim of $38.41 for handling charges, $1,101.62 for per diem and transportation, $24.90 for reproduction services, and $922.56 for tool, furniture, and equipment replacement.[5] *Id.*

The district court also found that the $4,825.59 for Corps labor related to the guide wall repairs was an appropriate charge. *Id.* at 324–325. The court held that this charge was supported by testimony that the figure was derived from time cards for the period that Corps laborers worked on the repairs. *Id.* The testimony revealed that services of such technical people as engineers were charged to the job as labor if they devoted more than an hour to the repairs. *Id.* at 325 n. 9. As with the miter gate repairs, the court refused to allow reimbursement for certain costs related to the guide wall repairs that were not supported by the evidence such as $68.16 for tool, furniture, and equipment replacement, $682.23 for reproduction services, and $422.63 for other facility charges. *Id.* at 325.

The extended and accurate analysis of the facts by the district court reveals that its ultimate holding was the product of a careful study of the evidence. *Indiana State Employees Ass'n v. Negley*, 501 F.2d at 1242. We hold that the district court's findings on these items of damages were not clearly erroneous.

## B. Overhead

■ Overhead expenses include those expenses that are necessary to keep a company or organization functioning as a going concern and that cannot be easily identified with any individual product or repair project. *See United Electrical, Radio and Mach. Workers v. Oliver Corp.*, 205 F.2d 376, 387 (8th Cir.1953). By its very definition, overhead serves to reimburse a party for its general operating expenses, which are composed of costs that are not directly allocable to a particular project. Furthermore, reasonable overhead charges can be included in the cost of repairs even if the injured party makes the repairs itself since such charges would be billed by any outside firm selected to complete the repairs. *Freeport Sulphur Co. v. The S/S Hermosa*, 526 F.2d 300, 304 (5th Cir.1976); *Bultema Dock and Dredge Co. v. Steamship David P. Thompson*, 252 F.Supp. 881, 885–86 (W.D.Mich.1966).

In admiralty cases, the courts have held that the grant or denial of damages rests within the discretion of the judge, who can base his decision upon principles of equity and justice. *See, e.g., United States v. Motor Vessel Gopher State*, 472 F.Supp. 556, 559 (E.D.Mo.1979), *aff'd*, 614 F.2d 1186 (8th Cir.1980). In *Motor Vessel*, the district court held that overhead charges should be reasonable in amount and factually related to the actual repair work performed. *Id.* at 559.[6] The court noted that

---

**5.** The district court stated that the United States' claim should be reduced by the total of the four disallowed items of basic overhead. Memorandum Opinion at 323–324. We note that the total of these disallowed items is $2,087.49 rather than the amount indicated by the district court, $2,089.49.

**6.** In *Motor Vessel*, the Eighth Circuit affirmed the district court's holding that the United States had not proved that the general overhead figure on repairs caused by a motor vessel's collision

into a U.S. lock and dam was necessary or reasonable. 614 F.2d at 1189. In noting that the government had applied a predetermined percentage to the total cost of repairs to determine overhead, the Eighth Circuit held that the government failed to specify how the overhead was related to the costs of the particular repair job. *Id.* The decision in *Motor Vessel* can be distinguished from the present case because in *Motor Vessel*, the Eighth Circuit noted that the district court's decision to severely limit over-

the overhead charges in that case were not based upon actual expenditures on items related to the accident, but were determined by the staff of the St. Louis Corps applying regulations promulgated by the Army Corps. *Id.* at 558.[7]

In the present case, the district court noted that the claim for district overhead on various repair jobs was wholly consistent with business practice and was adequately shown to be realistically based upon the Corps' experience in its overall operations. Memorandum Opinion at 323–324. At trial, both an accountant in the Corps' Civil Works division and the head Finance and Accounting Officer for the Rock Island District Corps testified as to the method for determining district overhead rates. Tr. I at 120–21, 143–47.[8] The

head officer, Mr. Gillum, and an independent certified public accountant, Mr. Haney, testified that the overhead rate is developed by estimating the annual overhead costs and dividing that estimate by the overhead allocation base, which is the estimated annual district costs exclusive of district overhead and outside contractors' fees. Tr. I at 143–44, 171–72. The overhead rate was applied as a flat percentage against total costs of the particular repair project exclusive of overhead and outside contractors' fees until fiscal year 1980, when the rate was applied only against direct labor costs. *Id.*[9] These rates are adjusted periodically, so that the overhead charged to the district's projects accurately reflects the total overhead actually incurred. Tr. I at 144.[10] Using this formula

---

head charges was influenced by the gross disparity between the government's original estimate for overhead of $8,291.16 and the government's final bill for overhead of $53,421.32. *Id.* at 1188, 1190. The court noted that this "ridiculous" disparity, representing a 544% increase over the original estimate, went unrebutted by adequate explanation. *Id.* Finally, the court concluded that the overhead figure was computed on an amount that already contained overhead charges, so that it would be unreasonable to apply overhead to overhead. *Id.* at 1189.

7. The district court in *Motor Vessel* stated that there had been no proof that the general overhead figure would not have existed but for the accident. 472 F.Supp. at 558. *See also United States v. Ohio Valley Co.,* No. 73–C–10, slip op. at 5 (S.D.Ind.1974), *aff'd on other grounds,* 510 F.2d 1184 (7th Cir.1975) (district court disallowed general overhead in a case similar to the Peavey collision because the government charged overhead on overhead and did not prove either the method or rationale for computation of the multiplier, nor did it establish that the percentage did not unfairly charge off expenses to a few jobs). As the government noted in its oral argument in the present case, this view of overhead by the court in *Motor Vessel* seems to run directly counter to the definition of overhead that it cannot be directly attributable to any project and that it exists regardless of any particular repair projects being handled by the Corps. Government counsel also stated that employees are hired to work for an agency rather than on a specific repair job, so that these employees will still be on the payroll regardless of any repair projects. Thus, we do not hold that a plaintiff must prove that the general overhead figure would not have existed unless the accident had occurred.

8. District overhead costs cover such items as administrative services and personnel. Tr. I at 146.

9. The head Finance and Accounting officer testified that prior to fiscal year 1980 when the district overhead costs were a percentage of all costs, these costs included some indirect costs such as tool, furniture, and equipment replacement and technical indirect. Tr. I at 146–47. The head officer stressed, however, that the money collected for district overhead on a particular repair project would not be applied to any of these indirect costs. *Id.* at 147. In its opinion, the district court held that the defendant's argument that the district overhead figure claimed had the effect of charging overhead on overhead has a superficial appeal, but was meritless. Memorandum Opinion at 323–324. The district court noted that to the extent that reasonable overhead charges are assessed to a particular project, those charges become a part of the base cost of the project itself. *Id.* In this case, the district court disallowed the indirect charge for tool, furniture, and equipment replacement, *id.,* but permitted recovery of $1,562.90 for technical indirect. *Id.* at 324–325. According to the court, this figure for technical indirect represented the unrecorded service of technical people, such as engineers, who had devoted less than one hour to the project. *Id.* at 325 & n. 9. Thus, we will not disturb the district court's finding that this overhead charge became part of the base cost of the project itself, so that there was no overhead on overhead.

10. In *Department of Water and Power v. United States,* 131 F.Supp. 329, 330 (S.D.Cal.1955), the court held that a plaintiff can recover indirect costs incurred in the performance of repair

to calculate the district overhead charge and adding to that amount the indirect labor costs,[11] the district court awarded $38,564.76 in overhead charges out of a total judgment of $425,373.24.[12]

■ We uphold the district court's award of overhead costs in this case. This award was necessary in order to compensate fully the Army Corps for its general operating expenses. In addition to explaining how the overhead rate was calculated and adjusted periodically, an independent certified public accountant testified at trial that the method of allocating overhead was adequate and proper. Tr. I at 176–77.[13] The accountant did not find that the method of allocating overhead in this case resulted in any disproportional distribution of costs. Tr. I at 180.[14]

The testimony concerning the reasonableness of the overhead rate distinguishes this case from *United States v. Thomas Petroleum Transit, Inc.*, No. 78–2292–B, slip op. at 5 (S.D.Ill.1980), where the court held that the record was devoid of any evidence offered by the United States to show that the overhead charges were reasonable. The court in *Thomas* stated that the fact that the government's counsel thought that the overhead on repairs in a lock and dam collision was reasonable was of no significance and that overhead does not automatically become reasonable because it is authorized in the Corps' regulations. *Id.* at 5–6. Although the court in *Thomas* found that no evidence had been presented to show that the overhead rate was reasonable, it noted that its holding was a very limited one and made no determination about the use of overhead charges in other repairs. *Id.* at 6. We find, as did the district court, that the overhead costs assessed against the defendant were reasonable.

## C. Prejudgment Interest

■ As was stated above, a reviewing court will not set aside the judgment of a district court sitting without a jury in an admiralty case unless the lower court's findings are clearly erroneous. *McAllister v. United States*, 348 U.S. at 20, 75 S.Ct. at 7–8; *Feeder Line Towing v. Toledo*, 539 F.2d at 1110. In admiralty cases, the district court has discretion to award prejudgment interest in order to compensate the injured party in full. *United States v. Motor Vessel Gopher State*, 614 F.2d 1186, 1190 (8th Cir.1980). The courts have observed that prejudgment interest in a sole fault collision case has always been allowed by maritime law unless exceptional circumstances render such an award inequitable, *Bankers Trust Co. v. Bethlehem Steel Corp.*, 658 F.2d 103, 108 (3d Cir.1981), *cert. denied*, 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982); *Gulf Oil Corp. v. Pan-*

work if the evidence shows that such costs are reasonably and factually related to the particular repair work in question. The court proceeded to approve a method of allocating supervisory and engineering costs similar to the formula used by the Army Corps in allocating district overhead. *Id.*

11. Indirect labor costs included $171.25 for technical indirect on the miter gates, $1,562.90 for technical indirect on the guide walls, $4,800.00 for inspection and administrative work on the bridge, and $1,926.00 for administrative expense attributable to work done on the roller gates.

12. The overhead charged represents 9.066% of the total judgment.

13. The practice of applying a flat percentage to direct costs incurred in a particular repair project in order to determine the amount of overhead was upheld by the Seventh Circuit sitting in diversity in the context of a collision between a train and a truck. *Baltimore and Ohio R.R. Co. v. Commercial Transp., Inc.*, 273 F.2d 447 (7th Cir.1960). In that case, the inspector of accounts for the railroad testified as to the methods used in computing the overhead and indicated that the percentages were not derived from the records or experience of the plaintiff, but from a formula contained in the current rules of a railroad association's manual. *Id.* at 449. In the present case, the overhead percentage rate was based on estimates and the actual records of the Corps' annual expenses.

14. At oral argument, in response to a question as to whether the flat percentage might be arbitrary, counsel for the government responded that an independent accounting firm had determined that the rate was not arbitrary based on a detailed examination of all overhead charges.

*ama Canal Co.,* 481 F.2d 561, 570 (5th Cir.1973). Peculiar circumstances that might prompt the district court to deny prejudgment interest include cases where the party requesting the prejudgment interest has unreasonably delayed prosecuting its claim, has made a bad faith estimate of its damages which precludes settlement or has not sustained any actual damages. *Bankers Trust v. Bethlehem Steel,* 658 F.2d at 108.

■ Although a district court can only deny prejudgment interest in cases involving extraordinary circumstances, a district court possesses broader discretion in determining when prejudgment interest should commence and what rate of interest to apply. *Independent Bulk Transp., Inc. v. The Vessel "Morania Abaco",* 676 F.2d 23, 25 (2d Cir.1982). The Seventh Circuit has held that the general rule in admiralty is to award prejudgment interest from the date of the collision, thereby compensating the plaintiff in full. *Bunge Corp. v. American Commercial Barge Line Co.,* 630 F.2d 1236, 1242 (7th Cir.1980); *Elgin, Joliet and E. Ry. Co. v. American Commercial Line, Inc.,* 317 F.Supp. 175, 177 (N.D.Ill.1970); *United States v. The M/V Martin,* 198 F.Supp. 171, 174, 177 (S.D.Ill.1961), *aff'd,* 313 F.2d 851 (7th Cir.1963). The district court in the present case awarded prejudgment interest at the rate of 11% per annum [15] from July 15, 1978, the date of the collision. Memorandum Opinion at 327.

■ We affirm the district court's award of prejudgment interest from the date of the collision. Prejudgment interest, as part of the loss itself, is awarded to a victim who has incurred out-of-pocket cash expenses and/or a loss of use of its property. *Gulf Oil v. Panama Canal,* 481 F.2d at 571. In cases involving collisions between two vessels, the courts have held

that prejudgment interest should not be awarded before the injured party pays for the repairs if damages include both demurrage costs and repair costs. *Stevens v. F/V Bonnie Doon,* 731 F.2d 1433, 1437–38 (9th Cir.1984); *Independent Bulk v. "Morania Abaco",* 676 F.2d at 25–26. The courts have reasoned that prejudgment interest on unspent money would be inappropriate when the injured party has recovered for loss of use or demurrage. *Id.* In the present case, the United States did not recover damages for loss of use, so prejudgment interest should be awarded from the date of the collision. In addition, the United States began incurring out-of-pocket cash expenses for the repair work immediately after the collision. By mid-1979, one year after the collision, the United States had spent $318,000 for repairs on the bridge and miter gates. By June 1980, the United States had expended over $410,-000 for repairs. Appellee's Brief at 17–18.

■ In awarding prejudgment interest of 11% from the date of the collision, the district court specifically found that there were no peculiar circumstances prompting the exercise of its discretion to deny prejudgment interest on the United States' claim. Memorandum Opinion at 327. The defendant on appeal has argued that the district court should not have awarded prejudgment interest because the United States did not send a bill to the defendant for lock gate repairs until February 11, 1981, and did not institute this suit until June 30, 1981, almost three years after the collision. The courts have held that prejudgment interest can be denied only when delays in the resolution of a case are directly attributable to the party claiming the prejudgment interest. *Bankers Trust v. Bethlehem Steel,* 658 F.2d at 109. Thus, delays which are due to the size, complexi-

---

15. Courts sitting in admiralty are not bound to set prejudgment interest at the legal rate prevailing in a particular state. *See, e.g., Federal Barge Lines, Inc. v. Republic Marine, Inc.,* 616 F.2d 372, 373 (8th Cir.1980). The district court in the present case noted that a precise determination of the cost of borrowing money over the relevant time period could not be definitely made.

Memorandum Opinion at 327. The court took judicial notice of the range of interest rates for the Treasury (11% to 18.35%) during the particular time period cited by the United States. *Id.* The court stated that it would apply the conservative rate of 11% as the prejudgment interest rate even though a somewhat higher rate could be fully justified. *Id.*

ty or need for extensive discovery in a case cannot be charged to the party claiming the prejudgment interest especially when the district court has expressly found no party responsible for such delays. *Id.* The district court in the present case granted a motion to enlarge the time for discovery due to the volume of documents regarding the United States' accounting procedures and the inherent difficulty in coordinating and compiling the documentation. Record at 9, 11. Furthermore, courts have held that a period of delay of one and a half to two years between the collision and the filing of the complaint is not so dilatory as to justify a denial of prejudgment interest when settlement negotiations have been ongoing. *Mid-American Transp. Co. v. Cargo Carriers, Inc.*, 480 F.2d 1071, 1074 (8th Cir.1973); *L & L Marine Service, Inc. v. Korf Transp. Corp.*, 514 F.Supp. 378, 384 (E.D.Mo.1981).

The United States began its temporary repairs and preparations for permanent repairs immediately following the collision and worked continuously on the miter gates regardless of the weather. Tr. I at 24, 29, 46–47, 59, 67–68. Peavey Barge Line was aware from the marine surveyors that it sent to the collision site that there had been a collision involving one of its vessels and the barges and that the United States had sustained damages. Plaintiff's Reply to Peavey Barge Line's Response on Motion for Summary Judgment, Attachment B, Record at 27. Peavey Barge Line only confessed liability for the damage caused by its vessel and barges on November 29, 1982, after the United States filed a motion for summary judgment on the issue of liability. After granting the United States' motion for summary judgment on the issue of liability, the court imposed sanctions against the defendant for its failure to admit that as a result of the collision, one or more of the defendant's barges damaged the dam, lock, and bridge. Record at 33. In view of the fact that the United States promptly began the repairs necessitated by the damage caused by the defendant and in light of the district court's specific finding that no peculiar cir-

cumstances existed to deny an award of prejudgment interest, this court affirms the district court's order to award prejudgment interest from the date of the collision even though the suit was instituted almost three years following the collision.

In conclusion, the district court's award of $425,373.24 for damages to the lock, dam, and bridge and of prejudgment interest from the date of the collision is affirmed.