620 F.Supp. 1377 (1985)
SHAPPERT ENGINEERING COMPANY, a corporation, Plaintiff,
v.
STEEL CITY MARINE TRANSPORT, INC., a corporation, in personam; and the M/V MAGNOLIA, her tackle, gear, engines, et cetera, in rem, Defendant.
No. 85-379A(6).
United States District Court, E.D. Missouri, E.D.
October 30, 1985.
Raymond L. Massey, Nicholas H. Ores, St. Louis, Mo., for plaintiff.
*1378 Daryl F. Sohn, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
GUNN, District Judge.
This matter is before the Court for a decision on the merits after trial to the Court sitting in Admiralty. Plaintiff brought this action to recover for damage to its cofferdam protection system allegedly caused when a tow owned and operated by defendant allided with the system as it navigated through Lock No. 19 on the upper Mississippi River on Sunday, March 4, 1984. After consideration of the testimony and exhibits introduced at trial, and the parties' briefs and post-trial material, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52, Fed.R.Civ.P.
Defendant, Steel City Marine Transport, Inc., is a corporation duly organized and existing under law and is the owner and/or operator of the M/V MAGNOLIA, a steel-hulled, diesel powered river towboat. Plaintiff, Shappert Engineering, Inc. (Shappert) is a corporation duly organized and existing under law. In 1983 Shappert entered into a contract with the Iowa Department of Transportation to construct a new bridge across the upper Mississippi River at Keokuk, Iowa, downstream of Lock and Dam No. 19. The main lock chamber of Lock 19 is 1200 feet long and 110 feet wide. There are two concrete guidewalls on either side of the lock extending downriver below the lower lock gates. The Shappert project required the installation in the river of several concrete piers, one of which was to be located approximately 30 feet downriver from the bullnose of Lock 19's riverward guidewall. In order to provide a dry site on which to build the pier, Shappert constructed a rectangular cofferdam, approximately 100 feet long.
To protect this relatively fragile structure, Shappert erected two rectangular "cribs," one at the upriver end and one at the downriver end of the cofferdam. The cribs, consisting of interlocking sheet pilings driven vertically into the river bottom were each filled with approximately 1,000 cubic yards of rock. Between the downriver crib and the bullnose of the existing riverward guidewall, Shappert placed six vertical steel beams along the channelward side of the cofferdam and attached two horizontal "rub-rails," each consisting of five lengths of steel welded together end-to-end, to the channelward face of these vertical beams. The entire protection system was designed as a buffer in the event of an impact from a passing tow, thereby protecting the integrity of the cofferdam itself. The protection system encroached about two feet into the navigable channel, approval for which was granted by the Coast Guard and the Army Corps of Engineers.
Construction of the cofferdam with its protection system was completed by January 1984. Lock 19 was opened for river traffic following the winter season on February 22, 1984. On March 1, 1984 an empty barge in tow of an upbound vessel rode up on top of the upstream crib as it navigated along the protection system. The following day a civil engineer employed by Shappert was sent to check the extent of the damage to the structure. Part of this inspection included walking along the top horizontal rub-rail, which was above water, while dragging an aluminum pole across the channelward face of the lower rub-rail, which was below water, to detect any protrusions into the channel. The engineer reported that the system was intact, and the lock was reopened for traffic. Thereafter, on March 2, 1984 and March 3, 1984, a number of vessels navigated through Lock 19 past the protection system without any difficulty.
At 6:44 a.m. on Sunday, March 4, 1984, the M/V MAGNOLIA with a tow of 12 loaded barges, arranged 4 long and 3 wide, entered the upstream end of Lock 19 and began locking downstream. The MAGNOLIA and its tow proceeded to navigate out of the lock chamber past the cofferdam and protection system site. The captain of the MAGNOLIA was aware of the construction and its encroachment into the channel. *1379 The tow was approximately 105 feet wide leaving a clearance of 3 feet between the rub-rails and the concrete guidewall on the opposite side of the channel. When the head of the tow was roughly one barge length past the the construction, some of the vertical beams and the downriver rockfilled crib fell over.
The facts thus related are virtually undisputed by the parties. The crux of the dispute in the present case is whether the damage to the protection system was caused by the MAGNOLIA or its tow making direct contact with the downstream crib and/or the rub-rails, as plaintiff claims, or by the MAGNOLIA or its tow catching on an underwater protrusion from the protection system, as defendant claims.
The Court finds that the MAGNOLIA or its tow directly struck the protection system causing the damage. Plaintiff's expert engineer testified that the nature and extent of damage involved in this case could not have resulted from indirect pressure to the system such as would have been exerted had the vessel hooked on an underwater protrusion. Plaintiff's civil engineer who inspected the protection system on March 2, 1984, for the specific purpose of determining whether there were any protrusions into the channel, testified that his inspection revealed that the channelward side of the system was intact and that there were no protrusions. It was unrefuted that in the two days between the civil engineer's inspection and the MAGNOLIA's accident a number of essels navigated safely past the construction site. The pilot of a vessel with a tow as wide as and longer than the MAGNOLIA's testified by deposition that he navigated downriver past the construction site without difficulty on March 4, 1984 at about 2:00 a.m. The Court finds all the foregoing testimony credible.
Although the captain and two deck hands of the MAGNOLIA testified that the tow maintained a distance of 1½ feet from the protection system at all times, they all testified that they never felt the tow catch on any obstruction. Defendant's other evidence included testimony by a marine surveyor who speculated that there must have been an underwater protrusion which caught the tow. There was also deposition testimony by a witness that immediately before the damage occurred, the tow was approximately three feet away from the protection work.
The Court would be less than candid if it did not state that resolution of this case presented close questions of fact. The Court concludes, however, that defendant's evidence was insufficient to rebut the strong inference that the MAGNOLIA or its tow directly hit and damaged the protection system. The Court further concludes that plaintiff sustained its burden of proof in establishing defendant's negligence in that defendant breached the duty to exercise such reasonable care and maritime skill that prudent navigators employ for the performance of similar services. See Mid-America Transp. Co. v. Nat'l Marine Service, Inc., 497 F.2d 776 (8th Cir.1974) (standard of care in admiralty; burden of ultimate persuasion remains with party asserting negligence).

Damages
Under general admiralty law, a vessel owner at fault in a maritime collision is responsible for the full cost of necessary and reasonable repairs to the damaged structure and for the loss of earnings while the repairs are being made. Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa, 761 F.2d 229, 233 (5th Cir. 1985); Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128, 129 (5th Cir.1972). The burden is on the plaintiff to prove that the amount claimed to repair the damages is fair and reasonably related to actual damages incurred. United States v. M/V Gopher State, 472 F.Supp. 556, 559 (E.D.Mo.1979), aff'd, 614 F.2d 1186 (8th Cir.1980). In the present case repairs to the protection system were done by plaintiff. The Court first finds that the repair method chosen was reasonable. The costs claimed by plaintiff for the repairs are as follows:

*1380
 Labor $14,610.16
 General Liability &
 Umbrella 584.41
 Workers' Compensation 2,775.93
 FICA 1,022.71
 Federal Unemployment
 Comp. 204.54
 State Unemployment
 Comp. 1,373.36
 ________
 SUBTOTAL Labor $20,571.11
 Plus Overhead 6,574.57
 ________
 TOTAL Labor $27,145.68
 Equipment 28,276.29
 Materials 20,996.30
 Plus Overhead 2,099.63
 ________
 TOTAL Materials 23,095.93
 _________
 TOTAL DAMAGES $78,517.90
 _________

The amount of $20,571.11 for labor is found to be an appropriate charge. It is supported by testimony that the figure is derived from time cards for the time Shappert employees devoted to the repair project. The Court finds that the amount of $6,574.57 for overhead on the labor cost is unreasonable. The Court recognizes that reasonable overhead expenses can be included in the cost of repairs even if the injured party makes the repairs itself. See United States v. Peavey Barge Line, 748 F.2d 395, 399 (7th Cir.1984). The overhead figure $6,574.57 was derived by applying to the basic labor cost a 20.3% factor for general and administrative overhead and a 12.1% factor for indirect project overhead. The Court concludes that while both types of overhead charges may be permissible, see id. at 400 n. 7, an overhead charge of 33% on labor costs is unreasonable and excessive. The evidence does not indicate how these percentage figures were derived. In United States v. Peavey Barge Line, 748 F.2d at 401 n. 12, the overhead charge which included both types of overhead claimed here represented 9.066% of the total award. The Court exercises its discretion based on principles of equity and justice in allowing plaintiff 10% of its direct labor costs or $2,057.11, as labor overhead.
Finally, the Court concludes that plaintiff met its burden of proving that $28,276.29 for equipment and $23,095.93 for materials, including overhead at 10%, constitute fair and reasonable charges for repairs to its damaged structure.
Plaintiff has also asked for an award of pre-judgment interest which is customarily awarded in admiralty cases unless there are exceptional or peculiar circumstances. See United States v. M/V Gopher State, 614 F.2d at 1190. The Court finds that plaintiff is entitled to prejudgment interest from March 4, 1984 at the rate of 10.11% per annum. This is the judgment rate prevailing at the time repairs were undertaken and as such, the appropriate rate to apply. See id.; United States v. Peavey Barge Line, 748 F.2d at 401-02.
Judgment is accordingly entered in favor of plaintiff, Shappert Engineering Co., in the amount of $74,000.44 plus pre-judgment interest from March 4, 1984 at the rate of 10.11% per annum.