**STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., Plaintiff,**

v.

**W.R. GRACE & CO., Defendant.**

**No. 89–3022.**

United States District Court, C.D. Illinois, Springfield Division.

Oct. 26, 1993.

See also, 834 F.Supp. 1046.

Edward J. Westbrook, J. Anderson Berly, Charleston, SC, David L. Drake, Randall A. Mead, Springfield, IL, for plaintiff.

Hugh V. Plunkett, III, John C. Childs, Minneapolis, MN, Ellen S. Kornichuk, Bell, Boyd & Lloyd, Chicago, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge:

Asbestos property-damage litigation.

Fifty day trial conducted piecemeal from January to August 1993.

End result: jury awards State Farm $17,889,632.47 damages, but also finds State Farm thirty percent negligent.

Now before the Court, W.R. Grace's motions:

(1) to dismiss all claims as untimely filed under the Illinois Construction Statute of Repose;

(2) for new trial;

(3) for judgment after trial.

### I. Background

State Farm brought this action to recover the costs of management, removal, and replacement of W.R. Grace's asbestos containing fireproofing, Monokote–3 (MK3), from State Farm's corporate headquarters in Bloomington, Illinois, and its regional office buildings in Tempe, Arizona and Austin, Texas. Construction of the three buildings took place between 1970 and 1973. State Farm originally sought damages based on the legal theories of strict liability, negligence, fraudulent misrepresentation, and willful and wanton misconduct. State Farm's total prayer for compensatory damages for the three buildings was $34,494,483.23. State Farm also sought punitive damages from W.R. Grace.

State Farm's negligence Count averred that asbestos was not necessary in MK3 and that when W.R. Grace was forced to discontinue sales of MK3 in light of regulations promulgated by the Environmental Protection Agency, it replaced the asbestos with shredded paper fiber. State Farm also alleges negligence because W.R. Grace never placed any warnings on MK3, despite the fact that W.R. Grace had knowledge of the harms of asbestos from: (a) its operation of an asbestos-contaminated vermiculite mine and MK3 production facilities (where workers were getting sick); and (b) its involvement in the late 1960's with the public health debate on asbestos. Despite this knowledge, State Farm alleges that W.R. Grace continued to sell MK3 until the federal ban in July 1973, even though W.R. Grace had developed a non-asbestos Monokote in 1970 and was selling it elsewhere.

W.R. Grace denied liability under any legal theory. In addition, W.R. Grace raised the following affirmative defenses: statute of

limitation, Illinois Statute of Repose, state of the art, misuse, comparative negligence, and assumption of the risk.

W.R. Grace took the position that the harms from in-place asbestos are greatly overstated. Specifically, W.R. Grace alleged that documents produced by State Farm revealed that airborne asbestos fiber levels in their buildings were well within and below any applicable government standard, demonstrating that W.R. Grace's fireproofing should not be removed and could be managed with an effective operation and maintenance program.

Jurisdiction of this Court was invoked under 28 U.S.C. § 1332.

The trial was bifurcated. On May 11, 1993, the jury returned a verdict on the liability phase of the trial. The jury returned a verdict of guilty on State Farm's Count of negligence and not guilty on State Farm's Counts of fraud, strict liability, and willful and wanton conduct. In addition, the jury found that State Farm was 30 percent contributorily negligent.

On August 26, 1993, the jury returned a verdict on the damages phase of the trial. The jury assessed State Farm's damages to be $17,889,632.47.

After the verdict, W.R. Grace moved for judgment as a matter of law claiming that this suit should be barred because of the Illinois Statute of Repose and the fact that the jury verdicts were inconsistent. W.R. Grace also seeks a new trial for a host of procedural and substantive issues.

## II. Motion for Judgment as a Matter of Law

### (A). Statute of Repose

The Illinois Construction Statute of Repose states that:

No action based upon tort, contract, or otherwise may be brought against any per-

son for an act or omission of such person in the design, planning, supervision, observation, or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission.

Ill.Rev.Stat., ch. 110, ¶ 13–214(b).

Because State Farm's buildings were constructed between 1970 and 1972 and this suit was not brought until 1989, W.R. Grace claims that the ten-year repose limit in this statute has expired and the suit should be barred.

### 1. Procedural History

This marks the fifth time that the Court has considered whether W.R. Grace is protected by this statute. On January 3, 1993, the Court denied W.R. Grace's motion for summary judgment on this issue. At that time, the uncontested evidence present in the record supported the finding that W.R. Grace was a "mere manufacturer" of asbestos materials. This distinction was important, we noted, because of the dicta in *Witham v. Whiting Corp.*, 975 F.2d 1342, 1346–47 (7th Cir.1992). *Witham* was the only Seventh Circuit opinion at that time which addressed the issue.

In *Witham*, the plaintiff sued under theories of strict products liability and negligence when he was struck by a girder attached to a 40–ton main hoist crane manufactured by the defendant. The Court noted that "[t]here may be a problem with applying the improvement to real property statute of repose to a manufacturer of a product used in the improvement who was otherwise uninvolved with the particular construction project." *Id.* at 1346. In addition, the court stated that the applicable legislative history did not extend the statute to protect the manufacturer of products.[1] However, this dicta was not dispositive—even by its own terms.[2] *Witham* conceded that the Illinois Supreme

---

1. "We note that Section 13–214 is titled 'Construction–Design management and supervision,' and the legislative history of that section indicates that its purpose is to protect architects, construction companies, engineers, and the like." (citing 81st Ill.Gen.Assem., House Proceedings, May 25, 1979, at 34).

2. *Witham* found that the Appellate Court of Illinois rejected an argument that a manufacturer does not fall within the class of defendants intended to be protected by the statute of repose. *St. Louis v. Rockwell Graphic Systems, Inc.*, 220 Ill.App.3d 704, 710, 163 Ill.Dec. 142, 148, 581 N.E.2d 93, 99 (1991).

Court must eventually resolve the issue. However, despite the disclaimer, the court found that defendant was not a mere manufacturer ("It did not simply pluck the crane from its inventory and ship it to Allied. Instead, it specially manufactured the crane for Allied based on information Allied provided about its plant." *Id.* at 1347.) and extended the statute of repose to protect the defendant.

Despite the forecast in *Witham,* Illinois Supreme Court did not resolve the issue. As a result, on January 15, 1993, this Court denied W.R. Grace's motion for interlocutory appeal. At issue was whether the Illinois Supreme Court opinion in *St. Louis v. Rockwell Graphic Systems, Inc.,* 153 Ill.2d 1, 178 Ill.Dec. 761, 605 N.E.2d 555 (1992), superseded the analysis of *Witham.* With the question of whether manufacturers are included within the statute of repose before it, the Illinois Supreme Court remanded the case back to the trial court for a determination of whether the equipment in question (a printing press) was an improvement to real property. As a result, this Court denied W.R. Grace's motion for interlocutory appeal because neither party submitted evidence on the issue of whether the asbestos was an improvement to property.

On April 22, 1993, the Court denied W.R. Grace's motion for judgment as a matter of law. The Court found that the statute of repose issue was extremely close and would be determined by the extent to which W.R. Grace's involvement met the statutory threshold of "design, planning, supervision or observation." We noted that at least one federal court in our circuit had excluded asbestos manufacturers from protection under the statute of repose.[3] Nevertheless, we waited for a definitive ruling from the Seventh Circuit or the Illinois Supreme Court.

Finally, on May 26, 1993, we denied W.R. Grace's motion for judgment as a matter of law after the liability portion of the trial on this issue. We invited the parties to address two issues in post-trial motions: (1) the legislative history behind the statute of repose (was the statute intended to protect only those who perform professional design and construction activities?); and (2) statutory construction (does the statute of repose protect only claims arising out of "design, planning, supervision, or observation," of the defendant, or all claims?).

### 2. *Legislative and Judicial History*

■ Contrary to *Whitham's* suggestion that the legislative history of the statute of repose protects a class of defendants (architects, engineers, and the like) and excludes another class (manufacturers of products), we find that the statute of repose does not exclude persons based upon their status. Rather, the pivotal issue is whether the defendant engages in the enumerated activities (i.e., was the defendant engaged in the "design, planning, supervision, observation, or management of construction," Ill.Rev.Stat. ch. 110, ¶ 13–214); *Hausman v. Monarch Machine Tool Co.,* 997 F.2d 351, 353–54 (7th Cir.1993) (" '[m]ere labels are not dispositive' and section 13–214 protects, on its face, anyone who engages in the enumerated activities." (citations omitted)).

Originally, the statute of repose was drafted to protect only certain design professionals or contractors.[4] Ill.Rev.Stat. ch. 83, § 24f (1965). This statute was struck down as unconstitutional in 1967. *Skinner v. Anderson,* 38 Ill.2d 455, 231 N.E.2d 588 (1967). In *Skinner,* the court held that section 29 of the Limitations Act (the predecessor to § 13–214) was unconstitutional as spe-

---

3. *Heider v. W.R. Grace,* 815 F.Supp. 1137 (N.D.Ill.1993).

4. The original statute of repose stated:

No action to recover damages for any injury to property, real or personal, or injury to the person, or for bodily injury or wrongful death, arising out of the defective or unsafe condition of an improvement to real estate, nor any action for contribution or indemnity for damages sustained on account of such injury, shall be brought against any person performing or furnishing the design, planning, supervision of construction, or construction of such improvement to real property, unless such cause of action shall have accrued within four years after the performance or furnishing of such services and construction. This limitation shall not be available to any owner, tenant or person in actual possession and control of the improvement at the time such cause of action accrues.

cial legislation because it protected architects and contractors from untimely lawsuits, but not others, such as owners, tenants or manufacturers of materials used in construction:

> The arbitrary quality of the statute clearly appears when we consider the architects and contractors are not the only persons whose negligence in the construction of a building or other improvement may cause damage to property or injury to persons. *If for example, four years after a building is completed a cornice should fall because the adhesive used was defective, the manufacturer of the adhesive is granted no immunity. And so it is with all others who furnish materials used in the constructing the improvement.* But if the cornice fell because of defective design or construction for which an architect or contractor was responsible, immunity is granted.

*Id.* at 38 Ill.2d at 459–60, 231 N.E.2d at 590–91. (Court's emphasis).

W.R. Grace argues that the above quotation demonstrates that the Illinois Supreme Court intended a manufacturer of a basic construction material (adhesive) to be protected under the statute of repose. The Court does not agree. The Court's conclusion is evident from the subsequent history of the statute. In 1979, the Illinois legislature passed a new statute of repose. The legislature eliminated the exclusivity language of the original statute and expanded the protection from untimely lawsuits to "any person" who, ten years or later, is accused of wrongful acts or omissions related to an improvement to real property.

This statute was again struck down by the Illinois Appellate Court in *People ex rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.,* 135 Ill.App.3d 765, 90 Ill.Dec. 448, 482 N.E.2d 155 (1985) (*Hellmuth I*). After citing the language of § 13–214 which protects "design, planning, supervision, observation or management of construction or construction of an improvement to real property" (90 Ill. Dec. at 450, 482 N.E.2d at 157), the panel recognized "again, the material provider whose product was defective causing injury or damages has no immunity...." *Id.* at 452–53, 482 N.E.2d at 159–60. The court believed that the exclusion of materialmen

(and owners of property) from protection was unconstitutional.

However, on appeal, the Illinois Supreme Court held that the legislative classification which concerned the appellate panel (exclusion of owners and materialmen) was not unconstitutional. *People ex. rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.,* 114 Ill.2d 252, 102 Ill.Dec. 412, 500 N.E.2d 34 (1986) (*Hellmuth II*). The court deferred to the legislature which it said could constitutionally classify "construction activities separately from other activities." *Id.* 102 Ill.Dec. at 416, 500 N.E.2d at 38. More importantly for our application, *Hellmuth II* stated that the statute of repose did not include or exclude persons "based upon their status (e.g. architect, contractor, materialmen)." *Id.* 102 Ill.Dec. at 415, 500 N.E.2d at 37. Rather, the court ruled that the statute of repose protects only those who engage in the enumerated activities protected by the statute: "design, planning, supervision, observation or management of construction." In this way, the court reasoned that a surety's issuance of a bond "cannot be deemed to be engaging in the 'design, planning, supervision, observation or management of construction, or construction....'" *Id.* 102 Ill.Dec. at 417, 500 N.E.2d at 39.

The legislative history surrounding the statute of repose also supports the interpretation that only those "persons" engaged in the "enumerated" activities are protected. In the legislative debates on the House floor, Representative John Dunn stated that the legislation was intended to protect those who exercise individual judgment (with concomitant individual responsibility) during construction projects:

> This is a Bill that would provide a statute of limitations for claims against architects, engineers, consulting engineers, contractors and builders.
>
> . . . .
>
> The purpose of this Bill is to provide some relief for professionals, who are trying to exercise their sound judgment in the design and construction of improvements to real property ... so that they and their

families are not liable all their lives and beyond lives and into the graves.

Eighty–First Illinois General Assembly, House Proceedings, May 25, 1979 at 10, 32.

However, when asked if the statute of repose "would apply to architects and contractors only," Mr. Dunn replied, "No. It would apply to the architect, the engineer, the contractor, *anyone* who was involved in the *planning, supervision, operation or management of construction* or the construction of an improvement to real property." *Id.* at 31 (emphasis added). At no time did the legislative history indicate that the statutory protections would specifically include or exclude the manufacturers of building products.

### 3. *Analysis*

■ Thus, to be protected by the statute of repose, W.R. Grace must have participated in the "design, planning, supervision, observation or management of construction, or construction" and the construction that W.R. Grace took part in must constitute an "improvement to real property." *Herriott v. Allied Signal, Inc.*, 998 F.2d 487, 489 (7th Cir.1993) (citing Ill.Rev.Stat. ch. 110, ¶ 13–214(b)).

### (a). *"Enumerated activities"*

The threshold level of construction-related activities that satisfy the statute of repose is not yet clear in Illinois law, or the law of our circuit. One Illinois Appellate Court recently stated that:

> To be included within the statute, a manufacturer must perform some role related to the construction site beyond provision of standard products generally available to the public and not custom designed for the project.

*People v. Asbestospray Corporation*, 247 Ill. App.3d 258, 186 Ill.Dec. 462, 467–68, 616 N.E.2d 652, 657–58 (1993).

However, *Asbestospray* does not assist this Court's analysis. In *Asbestospray*, the record was absent any evidence that the defendant had a role in the construction of plaintiff's building. Accordingly, the panel found that defendant was not entitled to the protection of the statute of repose. Therefore,

without any evidence in the record, it is impossible to determine what threshold of construction-related activities would have satisfied the panel in *Asbestospray*.

■ The Court finds the "activity analysis" formulated by the Missouri Supreme Court in *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822 (Mo.1991) (*cited with approval in Herriott v. Allied Signal, Inc.*, 998 F.2d 487 (7th Cir.1993); *Witham v. Whiting Corp.*, 975 F.2d 1342 (7th Cir.1992); *Herriott v. Allied–Signal, Inc.*, 801 F.Supp. 52 (N.D.Ill.1992)) is more helpful to this Court on this issue. Using the "activity analysis," manufacturers of products are protected by the statute of repose when they engage in "substantial participation at the construction site in significant activities in installing or incorporating" their product into the real property or, alternatively, if they custom make their product away from the construction site specifically for a particular project *and* then install this product at the site. *Allied Signal*, 801 F.Supp. at 57–8 (quoting *Blaske*, 821 S.W.2d at 837–38) (Emphasis ours).

■ The Court finds that W.R. Grace did not "custom design" and "install" the Monokote, nor "substantially participate" in the construction of State Farm's buildings. The evidence showed that the Monokote product was sold in bags to the contractor. The chemical composition of a bag of Monokote fireproofing did not change from job to job. The contractor (not representatives of W.R. Grace) then mixed the Monokote with water in the contractor's own equipment, and then applied the mixture to State Farm's buildings—again using the contractor's own equipment. At no stage in the construction process did W.R. Grace provide any equipment to the contractors installing the Monokote.

In addition, W.R. Grace's involvement in the construction process was minimal. The total cost of the Monokote product ($13,000) was minuscule when compared to the $23 million dollar cost of the construction project. W.R. Grace stated that it was their general policy to routinely meet with contractors to discuss mixing instructions, to check yields,

and to assist in the proper application of the fireproofing. These types of services were expected by the customer. W.R. Grace also advised architects, based upon W.R. Grace's expertise in performing "blue-print take-offs," on how to determine the fireproofing required to obtain a desired fire rating. However, W.R. Grace offered no evidence which quantified the amount of these services which were provided to State Farm. Indeed, no W.R. Grace representative ever attended the weekly State Farm construction progress meetings. Mr. Egan, Manager of W.R. Grace's Mid–West Region, did visit the construction site (for one day) at State Farm's headquarters in Bloomington, Illinois to troubleshoot a problem with the building's curtain wall.[5] Aside from the visit of Mr. Egan, there is no other evidence that a representative of W.R. Grace assisted in the construction of State Farm's buildings.[6] Overall, the headquarters construction project was a 3½ year job. At best, W.R. Grace representatives visited the job on a few isolated occasions (perhaps 4–5 days). This Court cannot find that such minuscule activities amount to "substantial participation."

### (b). *"Act or Omission"*

■ Second, this suit does not allege W.R. Grace was negligent in any of the "enumerated" activities (the "design, planning supervision, observation or management of construction, or construction of an improvement to real property...." Ill.Rev.Stat. ch. 110, ¶ 13–214) of the statute of repose. Instead, State Farm claimed W.R. Grace was negligent because: (1) asbestos was unnecessary in the manufacture and sale of Monokote; (2) W.R. Grace put no warning label on Monokote packaging or literature concerning the health hazards of asbestos; and (3) W.R. Grace conducted inadequate testing on the Monokote before sale. Because State Farm claims that W.R. Grace was negligent in its manufacturing-related activities, rather than its construction-related activities, State Farm argues that W.R. Grace is exempt from the statute of repose.

The Court agrees.

The proposition that manufacturers receive protection from the statute of repose only if they are sued for on-site construction activities appears in both Illinois judicial precedent and the legislative history of the statute of repose. In *Delta Verwaltungs Raf Gesellschaft Mit Beschrankter Hafung v. Kenneth Rowe,* 1985 WL 2055 at *1 (N.D.Ill. July 5, 1985), the plaintiff employed an architect to inspect a building that plaintiff intended to buy. The architect's inspection was negligent, resulting in plaintiff incurring additional expenses to fix damage that the architect missed. The architect moved for summary judgment arguing that he was protected by the statute of repose. *Delta* rejected this view, holding that even though defendant was an architect, plaintiff's cause of action did not arise out of the architect's failure to perform any of the enumerated acts of the statute of repose:

> There is no indication in the legislative history that Section 13–214(A) was to apply to all activities of the architects. Rather, the legislative history indicates that Section 13–214(A) applies only to those actions involving the planning, supervision, operation or management of construction, or construction of improvements to real property, and not to actions such as those described herein which are unrelated to construction.

*Id; McIntosh v. A & M Insulation Co.,* 244 Ill.App.3d 247, 185 Ill.Dec. 69, 614 N.E.2d 203 (1993) (plaintiff with asbestosis was not allowed to proceed against defendants on the theory that defendants were sellers and distributors of asbestos containing products); *Asbestospray,* 247 Ill.App.3d at 262, 616 N.E.2d at 657 ("Other courts have determined that Section 13–214 of the Code would not apply to a landowner where the action is founded solely on the defendant's status as landowner ... but would apply to a landowner being sued for his own act or omission in one of the specified construction-related activities"); *Hellmuth II,* 114 Ill.2d at 256, 102

---

5. It is undisputed that W.R. Grace representatives did not visit the construction of the State Farm regional headquarters buildings in Tempe, Arizona and Austin, Texas.

6. The visits of Mr. Bourke and Mr. Lyons (other agents of W.R. Grace) were not related to the construction or application of the Monokote.

Ill.Dec. at 416, 500 N.E.2d at 38 (surety not protected by statute of repose because plaintiff's claim arises out of breach of contract).

In addition, as mentioned above, Representative Dunn, a sponsor of the Illinois Statute of Repose Bill stated that the bill was intended to protect only suits against construction-related activities: "It [the bill] would apply to the architect, the engineer, the contractor, anyone who is involved in the planning supervision, operation or management of construction, or the construction of improvements to real property." Transcript of House Debates, May 25, 1979, at 29–32.

### (c). *Special Jury Question*

■ Following the liability portion of this trial, at the request of W.R. Grace, the following special question was submitted to the jury:

Did W.R. Grace provide design, planning, supervision, observation or management of construction services related to the installation of fireproofing to State Farm Mutual Automobile Insurance Company in addition to supplying bags of Monokote 3 and Monokote 4 fireproofing?

The jury returned an answer of "YES."

Nevertheless, the Court finds that this special question is without legal relevance. In *St. Louis v. Rockwell Graphic Systems, Inc.*, 153 Ill.2d 1, 178 Ill.Dec. 761, 762, 605 N.E.2d 555, 556 (1992), the court ruled that what constitutes the term "improvement" within the statute of repose is a question of law. This decision is tantamount to ruling that the interpretation of the statute of repose is a matter of law.

Accordingly, for the above reasons, the Court DENIES W.R. Grace's motion for judgment as a matter of law under the Illinois Statute of Repose.

### (B). *Inconsistent Jury Verdicts*

■ W.R. Grace also argues that judgment after trial is warranted because the jury verdict was inconsistent. First, at the end of the liability phase of the trial, the jury returned a partial verdict for State Farm on the issue of negligence. At this time, the jury also found W.R. Grace not guilty on the strict products liability Count. W.R. Grace argues that because State Farm's cause of action focused solely on the manufacturing activities of W.R. Grace, the jury cannot find negligence without also finding against W.R. Grace on strict liability.

■ This argument is without merit. To begin with, W.R. Grace specifically waived any objections to the facial invalidity of the jury instructions at the jury instructions conference.[7] In addition, the jury could find that while the product was not unreasonably dangerous, the manufacturer's conduct failed to meet the appropriate standard of care. This is because the negligence theory measures the reasonableness of the manufacturer's *conduct*, while strict liability measures whether the product was *defective*. *Davis v. FMC Corp., Food Processing Machinery Div.*, 771 F.2d 224, 230 (7th Cir.1985) (citing *Kossifos v. Louden Machinery Company*, 22 Ill.App.3d 587, 591, 317 N.E.2d 749 (1974)).

■ Second, W.R. Grace argues that the jury verdict was inconsistent because the finding that State Farm was 30 percent contributorily negligent is inconsistent with the jury's finding that State Farm did not know about its cause of action until 1986. In other words, W.R. Grace argues that the jury must have found State Farm negligent at the time of sale and therefore knew of its claim at the time of sale. W.R. Grace offers no authority to support this position. Moreover, as stated above, this argument was waived by counsel for W.R. Grace at trial. In addition, the jury could well have found State Farm's negligence occurred much later than at the time of sale of the fireproofing.

### III. *Motion for New Trial*
### (A). *Standard for New Trial*

W.R. Grace next moves for a new trial. The discretion and authority to grant a new

---

7. Upon receiving the verdict in the liability phase, the following exchange between the Court and counsel transpired:

The Court: [d]o either of you see any conflict between the verdict form and/or any of the special question answers?
Mr. Plunkett: I do not see a direct conflict. Tr. 6941.

trial is delegated to this Court and involves this Court determining whether the "verdict is against the weight of the evidence, ... the damages are excessive, or ... for other reasons, the trial was not fair to the party moving." *Selle v. Gibb,* 567 F.Supp. 1173, 1183 (N.D.Ill.1983) (*quoting Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940)). "Rule 59 gives the trial judge ample power to prevent what he considers to be a miscarriage of justice. It is his right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so." *Juneau Square Corp. v. First Wisconsin National Bank,* 624 F.2d 798, 806–7 (7th Cir.1980).

### (B). *Analysis*

#### 1. *Testimony of Dr. Corn and Dr. Craighead*

■ Throughout this trial, the Court sought to ensure both parties were allowed full discovery into their opponent's expert witnesses. On February 5, 1993, the Court precluded State Farm's expert witness Dr. Anderson from testifying about his mesothelioma study. The data for this study was based on confidential (and undiscoverable) health records from the State of Wisconsin. The Court concluded that though Dr. Anderson could testify about his opinions in other matters, we would restrict his testimony concerning the mesothelioma study.

W.R. Grace now objects to the application of this rule to its own experts Dr. Corn and Dr. Craighead. During the depositions of Dr. Corn and Dr. Craighead, each was specifically asked if they had formed any opinions as to State Farm's asbestos cross-contamination problem, State Farm's asbestos operation and maintenance program, the reports and opinions of State Farm's experts, and the reasonableness of State Farm's abatement costs. Each expert had no opinions on any of these areas. Later, before trial, counsel for W.R. Grace gave information to these experts that allowed them to formulate opinions on these areas. This strategy by W.R. Grace effectively prevented State Farm from fully discovering the opinions of W.R. Grace's experts before trial. Therefore, to preserve fairness of the discovery process, the Court determined that Dr. Corn and Dr. Craighead would not be allowed to testify into areas which they expressed no opinion during their depositions.

#### 2. *Testimony of Kevin Boles and Gerald Karches*

■ On May 27, 1993, W.R. Grace disclosed its intention to call Kevin Boles and Gerald Karches as fact witnesses during the damages phase of this trial. These witnesses had personal knowledge of State Farm's asbestos removal costs, specifically, the alleged inflated fees of State Farm's asbestos consultant Hall–Kimbrell. Plaintiff moved to exclude the adding of these witnesses to the witness list. On July 30, 1993, the Court, by written order, refused to add these witnesses to the witness list.

The Court reconfirms its July 30, 1993 ruling.

To begin with, these witnesses were added four months after the final pre-trial conference (held on January 19, 1993) in this case. At that conference both sides were required to list their witnesses or be precluded from calling them at trial. Eight days after the conference, State Farm moved to add an additional witness who had just testified against W.R. Grace in another case. The Court refused to allow the addition of this witness citing: "The Court has no desire to open the flood gates and allow this trial to be prolonged *ad nauseam.* No additional witnesses will be allowed after the final pre-trial conference." Order, February 17, 1993, at p. 1. Throughout the trial, the Court enforced this even-handed approach to both parties—no witness testified who was not identified at the time of the final pre-trial conference.

Finally, W.R. Grace had at least constructive knowledge of the J & S and Southwest Hazard problems (the areas that these witnesses would have testified to at trial) long before the final pre-trial conference in this case. Indeed, W.R. Grace included some of the correspondence between State Farm and J & S on their original exhibit list. Therefore, W.R. Grace's claim of prejudice or surprise about the J & S and Southwest Hazard issue, or the claim that these witnesses could not be identified at an earlier date, lacks merit.

### 3. *American Insurance Association*

 On April 28, 1993, three months after the pre-trial cutoff, W.R. Grace sought to add witnesses and documents pertaining to the American Insurance Association (AIA). Many of these documents were available to W.R. Grace before the final pre-trial conference in this case. Nevertheless, W.R. Grace sought to add witnesses and evidence purporting to show that State Farm had knowledge about AIA published information regarding asbestos-containing products when State Farm constructed its buildings.

At that time, the Court deferred ruling on whether to allow evidence of State Farm's connection with the AIA. The Court granted W.R. Grace leave to obtain additional foundational evidence on this issue. However, the Court warned W.R. Grace that it would strike all reference to the AIA if W.R. Grace failed to link State Farm to the AIA.

Finally, on May 4, 1993, the Court instructed the jury to disregard any information concerning the AIA. A jury instruction was submitted to the jury during the liability portion of the trial with the same guidance.

The Court adheres to its previous position because W.R. Grace failed to establish any foundation or connection between State Farm and the AIA. Indeed, State Farm produced an affidavit from the Executive Vice President of the AIA showing that State Farm was not—nor had ever been—a member of the AIA. Moreover, W.R. Grace had knowledge of the AIA before final pre-trial conference. This issue should have been investigated long before trial began—instead of during the middle of the trial.

In addition, the jury instruction submitted on the AIA was not prejudicial to W.R. Grace. The Court rejected a more strongly worded instruction proposed by State Farm. The instruction given to the jury merely required the jury to disregard information concerning the AIA.

### 4. *John Walsh*

 During the damages phase of trial, W.R. Grace introduced (over objection of State Farm) the testimony of its expert witness John Walsh. Mr. Walsh's testimony was limited to projects which he had "personally bid." W.R. Grace moves for a new trial on this limitation.

W.R. Grace's position is frivolous. On June 4, 1993, the Court denied State Farm's motion in limine to exclude the testimony of John P. Walsh during the damages phase of this trial. It was a close call. State Farm had twice deposed Mr. Walsh (October 28, 1992 and January 15, 1993). Before both depositions, Mr. Walsh had been presented with State Farm's "damage summary" indicating what State Farm would include or exclude from its claim. Nevertheless, at both depositions, Mr. Walsh was unable to form an opinion on State Farm's documents comprising its "damages summary." *See e.g.* Walsh Depo. 10/28/92 at p. 90.

At trial, State Farm moved to exclude the testimony of Mr. Walsh because now, after having been unprepared at two depositions to offer opinions, he now had opinions as to State Farm's damages. The Court reluctantly denied State Farm's motion with the caveat that State Farm would be allowed full discovery during trial of Mr. Walsh's newly formed opinions.

State Farm then sought to depose Mr. Walsh's former employer Mr. Kynoch. At the behest of W.R. Grace's motion for a protective order, the Court limited State Farm's discovery of Mr. Kynoch to jobs that Mr. Walsh "bid personally." Indeed, W.R. Grace's counsel at the deposition of Mr. Kynoch took the position that Mr. Walsh's opinions were based on jobs that Mr. Walsh "bid personally." Based on this position, W.R. Grace's counsel refused to produce any documents on projects other than those which Mr. Walsh had "bid personally." Accordingly, the Court limited Mr. Walsh's expert opinion at trial to jobs in which he "bid personally."

Now, contrary to its position at the deposition of Mr. Kynoch, W.R. Grace claims it was prejudiced when the Court precluded Mr. Walsh from testifying about his experience from other jobs. The Court finds that no prejudice existed. Though Mr. Walsh was supposed to be limited to jobs in which he "bid personally," his testimony was much more expansive and included his experience

while working on other jobs.[8] More importantly, W.R. Grace cannot now claim prejudice when the limitation on the scope of Mr. Walsh's testimony was created by: (1) its own motion for protective order; (2) the position of W.R. Grace's counsel during the deposition of Mr. Kynoch; (3) Mr. Walsh's lack of preparation at his first two depositions.

### 5. *Mr. Walsh's Damage Notebooks*

■ During the damages phase of trial, State Farm outlined its damages in a series of 15 three-ring notebooks. These exhibits were compilations of invoices incurred by State Farm as a result of abatement activities.

To rebut State Farm's claim that abatement of asbestos was necessary, W.R. Grace called Mr. Walsh as a damages expert witness. As part of Mr. Walsh's trial preparation, he went through the 15 notebooks and marked which invoices he thought were not related to the State Farm's abatement project. Mr. Walsh's notebooks were identical to State Farm's with the exception that: (1) the invoices were printed on pink paper (as opposed to white); (2) the invoices were flagged with a red post-it sticker. Mr. Walsh's series of notebooks were marked as defense exhibits 1949.1–1949.15. The Court ruled that these exhibits could be used as demonstrative evidence only and would not be allowed to go to the jury.

The Court properly treated these exhibits at trial. To begin with, these exhibits were never timely listed by W.R. Grace on any exhibit list as part of the pre-trial order. Indeed, Mr. Walsh admitted during cross-examination that his notebooks were not prepared until trial. Accordingly, these notebooks violated the Court's pre-trial order and were properly excluded. Second, during the liability portion of the trial, the Court prevented State Farm from introducing evidence that was highlighted and evidence with tabs from reaching the jury. The Court insisted that all highlighting be removed from the evidence (if the highlighting did not accompany the original production of the evidence to the opposing party). The Court excluded the highlighted exhibits of Mr. Walsh under the same principle.

### (C). *Jury Instructions*

#### 1. *Duty to Warn*

■ The Court charged the jury with the following instruction:

> If W.R. Grace knew or should have known *at the time* it sold the MK3 to State Farm that its product was hazardous, then W.R. Grace was under a continuing duty to communicate such knowledge to State Farm. (Emphasis ours).

W.R. Grace objects to this instruction citing *Carrizales v. Rheem Manufacturing Co.,* 226 Ill.App.3d 20, 168 Ill.Dec. 169, 179, 589 N.E.2d 569, 579 (1991), *app. denied,* 146 Ill.2d 623, 176 Ill.Dec. 794, 602 N.E.2d 448 (1992). However, *Carrizales* actually supports the Court's position:

> Illinois law has been reluctant to impose a duty to warn beyond the time when the product leaves the manufacturer's control *unless the manufacturer knew or should have known at that time that the product was defective.*

*Id.* 168 Ill.Dec. at 179, 589 N.E.2d at 579 (Emphasis ours).

Here, the Court did not impose a duty to warn on the manufacturer where a manufacturer learns of a hazard *subsequent* to the time the product left its control. Rather, consistent with Illinois law, the instruction imposed a duty on the manufacturer to warn if the manufacturer had knowledge of the defective product at the time of the sale.

#### 2. *Assumption of Risk*

■ Next, W.R. Grace frivolously argues that the Court's assumption of risk special interrogatory was in error. This instruction properly instructed the jury to consider the assumption of risk defense if it found against W.R. Grace on the basis of strict liability or negligence. The special interrogatory also told the jury only to consider the assumption of risk defense with regard to strict liability in tort.

Ironically, it was W.R. Grace who suggested the necessity of this instruction. Original-

---

8. Tr. 8284, 8286, 8557, 8558, 8567, 8695, 8707, 8764.

ly, the Court submitted its own assumption of risk instruction because *neither* party submitted this requisite instruction as part of their proposed jury instructions.[9] Then, at the behest of both parties, the Court amended the assumption of risk instruction to the form that was submitted to the jury:

> If you find that State Farm assumed the risks relating to the hazards of the fireproofing in its building, enter the percent of fault, if any, on Special Question No. 6.

> Special Question No. 6 states:

> As to Count I (Strict Liability), if you find Plaintiff, State Farm assumed the risk, what percentage, if any, was State Farm at fault?

■■■ Counsel for W.R. Grace assisted in the crafting of the language of these instructions which both parties specifically agreed was proper. W.R. Grace cannot now object to the validity of this instruction.

### 3. *Choice of Repair*

■■■ State Farm's position at trial was that it should be able to choose the appropriate method to repair the asbestos-contamination. State Farm removed much of the asbestos in its buildings. Therefore, State Farm took the position that damages should be largely based on removal costs. W.R. Grace took the position that State Farm should not have removed the asbestos, but instead should have managed the asbestos with an operation and maintenance program until demolition of the building. Hence, according to W.R. Grace, the measure of damages should only be the cost of the operation and maintenance program. However, both choices require the eventual removal of asbestos. Federal regulations (NESHAPS) require the removal of all asbestos at the demolition of the building.

The Court submitted the following instruction to the jury:

In this case, the proper measure of damages is the cost of repair, which is the cost of removing the asbestos fireproofing and its damage from State Farm's buildings and the costs associated therewith. Although you have heard evidence that all of the asbestos has not yet been removed, that does not change the measure of damages. The future cost of removal of the remaining asbestos should be calculated as well. It is for you to decide when the fireproofing should have been or should be removed.

The owner of damaged property has discretion to decide how to fix the damage to the property. He may choose the repair method which he deems to be best suited to the restoration of its property to its pre-damaged state. . . .

This instruction was crafted from two parts. The second paragraph of the instruction was proposed by State Farm. The first paragraph was drafted by the Court over the strenuous objection of State Farm at trial. W.R. Grace never proposed any instruction on this issue. Nevertheless, W.R. Grace now objects to the second paragraph of this instruction.

The Court's instruction was proper. First, the instruction is firmly grounded in Illinois law.[10] *Northwest Commerce Bank v. Continental Data Forms, Inc.*, 233 Ill.App.3d 124, 174 Ill.Dec. 249, 251, 598 N.E.2d 446, 448 (1992); *United States v. Peavey Barge Line*, 590 F.Supp. 319, 323 (C.D.Ill.1984) *aff'd,* 748 F.2d 395 (7th Cir.1984).

Second, W.R. Grace suffered no prejudice. The Court gave W.R. Grace wide latitude to argue that a building owner such as State Farm should have managed the asbestos in place instead of promptly removing the fireproofing. Even though W.R. Grace never offered a jury instruction, the Court added the last sentence to the first paragraph of the instruction in light of W.R. Grace's position at trial. In any event, there is nothing incon-

---

9. Indeed, W.R. Grace, then, and now, cites no authority for their proposition. Now, in their brief for new trial, they neither cite the specific jury instruction which they claim was in error (the Court is left to guess which assumption of risk instruction W.R. Grace refers to), nor is there a direct citation to the transcript).

10. W.R. Grace offers no authority for their position that the victim of a tort does not have a choice of repair.

sistent with the two paragraphs. Paragraph two addresses the method of repair (removal vs. operation and maintenance). Paragraph one deals with the timing of the repair (e.g. must the asbestos be removed now or at demolition?). W.R. Grace took every opportunity to argue to the jury that State Farm should have managed its asbestos in place until some later date in the future when the building is inevitably demolished. The jury simply disagreed.

#### 4. *Nominal Damages*

 The Court also refused to submit a nominal damage instruction to the jury. This refusal was appropriate.

First, the jury did not consider any evidence in the damages phase of the trial that nominal damages are appropriate. Unlike the one case W.R. Grace cites in support of its proposition,[11] the position of W.R. Grace throughout the trial had been that the measure of damages should be the operation and maintenance costs of containing the asbestos. At a minimum, the expert witnesses for W.R. Grace testified that this cost would run into the millions of dollars. Given W.R. Grace's position, and the fact that W.R. Grace never submitted any evidence to the jury that damages would be nominal, the Court properly refused the nominal damages instruction.

 Second, during the liability portion of the trial, the jury found that: (1) State Farm's properties were damaged; and (2) that the negligence of W.R. Grace was a proximate cause of the damage to State Farm's properties. Where property "damage" is proved, compensatory—not nominal—damages are inferred. *See Rosario v. Livaditis*, 963 F.2d 1013, 1021 (7th Cir.1992) ("A finding of liability for violations of RICO is conspicuously inconsistent with an assessment of zero damages for those violations since the jury was required to find that the class suffered an injury to business or property before finding the debtor liable."); *Gavcus v. Potts*, 808 F.2d 596, 97–99 (7th Cir. 1986) ("Nominal damages can be awarded when no actual or substantial injury has been alleged or proved, since the law infers some

damage from the unlawful entry of land.... To allow only nominal damages under the circumstances presented because of lack of physical harm would permit the trespasser to enjoy the benefits of his tort without fully compensating Plaintiff for his loss."); *Stirs, Inc. v. Chicago*, 24 Ill.App.3d 118, 320 N.E.2d 216 (1974).

Third, the Court took judicial notice of the NESHAPS regulations in our January 14, 1993 Order. In that Order, the Court stated that the NESHAPS regulations would serve to establish the guidelines for assessing damages. Because the jury found W.R. Grace negligent in supplying asbestos, it necessarily follows from NESHAPS that State Farm must eventually remove the asbestos prior to demolition. This removal cost will warrant more than a nominal damages award.

*Ergo*, for the above reasons, W.R. Grace's motion for judgment after trial, and alternatively, motion for new trial is DENIED. The Clerk is directed to tax costs in this case with the entry of this order.

---

11. W.R. Grace cites no authority for its position in its motion for new trial.